IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 2:16-cr-00940-DCN |
| vs. ) | |
| ) | **ORDER** |
| ANTWAN HEYWARD ) | |
| _____) | |

This matter is before the court on the sentencing of Antwan Heyward ("Heyward"). In this sentencing, there is a dispute over whether the offense conduct satisfies the cross-reference for second-degree murder. For the reasons set forth below, the court finds that it does.

## I. BACKGROUND

Heyward pleaded guilty to felon in possession of a firearm. On the night of July 18, 2014 at approximately 2:30 AM, Heyward shot out of the porch of the house of Joseph Foreman ("Foreman") at 2232 Suffolk Street in North Charleston, SC. The shot went through a car windshield and hit Collette Warren ("Warren"), a housekeeper at a downtown hotel whom Heyward knew socially, killing her instantly. Heyward pleaded guilty to felon in possession of a firearm in federal court.[1]

A presentence investigation report ("PSR") was prepared in this case. Both Heyward and the government submitted objections to the PSR. Because this sentencing presents complex issues of law and fact, the court issues this written order to detail the

---

[1] Heyward was indicted on murder charges in state court, which held a lengthy "stand your ground" hearing. The state court found that Heyward did not have immunity under South Carolina's Castle Doctrine. Upon the adoption of this case and the charge of felon in possession of a firearm in federal court, the State dropped all of Heyward's state court charges.

1

particularized findings that contributed to the court's calculation of the cross-reference issue. It does not modify the sentence or its foundation.

## II. DISCUSSION

This matter is before the court on the sentencing of Antwan Heyward, who has pleaded guilty to being a felon in possession of a firearm. The issue before the court is whether the appropriate cross-reference is to voluntary manslaughter or second-degree murder. The PSR recommends that the appropriate cross-reference is second-degree murder.[2] Heyward rebuts that the appropriate cross-reference is voluntary manslaughter, as he had recently received a settlement for his worker's compensation claim of $10,000 and he was afraid that someone was coming to rob him of the check. This is an imperfect self-defense argument. Heyward also argues that he was high on cocaine at the time of the shooting, and that his voluntary intoxication obviates the state of mind required for second-degree murder. The government rebuts that the appropriate cross-reference is second-degree murder because Heyward's actions were a gross deviation from the standard of reasonable care.

As a threshold matter, Heyward and the government present drastically different versions of Heyward's relationship with Foreman, Heyward's relationship with Warren, and the facts supporting Heyward's imperfect self-defense theory. During the hearing on this issue, neither Heyward nor the government presented any testimony. Therefore, the

---

[2] Based on Heyward's offense level of 35 (with the second degree cross-reference applied) and criminal history category of 2, Heyward should receive a sentence of 188–235 months under the Guidelines. However, the statutory maximum term of imprisonment on a felon in possession charge is 120 months.

2

court reviewed the transcript of the "stand your ground" hearing in state court as well as the state court order on that issue to come to an understanding of the facts of the case.

The elements for second-degree murder in violation of 18 U.S.C. § 1111 are: (1) the unlawful killing of a human being; (2) with malice aforethought; and (3) within the special maritime or territorial jurisdiction of the United States. Malice aforethought "may be established by evidence of conduct which is reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm." United States v. Williams, 342 F.3d 350, 356 (4th Cir. 2003). Voluntary manslaughter is defined in 18 U.S.C. § 1112(a) as "the unlawful killing of a human being without malice" and "[u]pon a sudden quarrel or heat of passion." As the Tenth Circuit held:

> [V]oluntary manslaughter encompasses all of the elements of murder: it requires proof of the physical act of unlawfully causing the death of another, and of the mental state that would constitute malice, but for the fact that the killing was committed in adequately provoked heat of passion or provocation. Thus, the only difference between second degree murder and voluntary manslaughter in the homicide hierarchy is that voluntary manslaughter is committed in the heat of passion, and the presence of this mitigating factor negates the malice that would otherwise attach given an intentional or reckless mental state.

United States v. Serawop, 410 F.3d 656, 665 (10th Cir. 2005) (citation and internal quotation marks omitted).

### A. Imperfect Self Defense

Heyward advances an imperfect self-defense theory, and argues that this negates the malice aforethought intent required for a second-degree murder cross-reference. The court disagrees.

Shooting into a car in his driveway means that at the very least, Heyward was aware that there was a high risk of serious bodily harm.  See United States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000) ("'[S]econd degree murder's malice aforethought element is satisfied by: . . . (2) intent-to-do-serious-bodily-injury . . .'") (quoting United States v. Pearson, 159 F.3d 480, 486 (10th Cir. 1998)); United States v. Fleming, 739 F.2d 945, 948 (4th Cir. 1984) (Holding that to support a conviction for murder, the government "need only" prove that the defendant acted "without regard for the life and safety of others").  Heyward argues that he was acting in self defense, because he believed the car's occupants were coming to rob him of a recently-acquired settlement check.  Certainly, courts have found that where there is evidence a person was scared for his life, a jury should be instructed on voluntary manslaughter.  For example, in Smith v. State, 370 S.W.2d 543 (Tenn. 1963), the court held that the evidence was not sufficient to show that the defendant acted with malice aforethought in killing the deceased, and that the evidence did not, therefore, sustain the verdict of second-degree murder.  There, the defendant was a night watchman on duty and was suddenly confronted with a person coming toward him in the dark with a flashlight, in a building where burglaries had been committed previously.  Id.  Of course, just because an instruction was given to a jury on voluntary manslaughter does not mean that it is the correct cross-reference here.  After all, at sentencing the court is responsible for determining the facts by a preponderance of the evidence and applying a cross reference accordingly.

The court now turns to determine whether Heyward can advance a colorable self-defense argument under either South Carolina or federal law.  The court finds that he cannot.

Under the so-called "Castle Doctrine" statute, codified as the Protection of Persons and Property Act ("PPPA"), S.C. Code Ann. § 16-11-410 et seq. (effective June 9, 2006), one is not required to retreat from his dwelling place. See State v. Gordon, 122 S.E. 501, 502 (S.C.1924) ("One attacked, without fault on his part, on his own premises, has the right, in establishing his plea of self-defense, to claim immunity from the law of retreat, which is ordinarily an essential element of that defense." (emphasis added)). There are four elements required by law to establish a case of self-defense:

> First, the defendant must be without fault in bringing on the difficulty. Second, the defendant must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger. Third, if his defense is based upon his belief of imminent danger, a reasonably prudent man of ordinary firmness and courage would have entertained the same belief. If the defendant actually was in imminent danger, the circumstances were such as would warrant a man of ordinary prudence, firmness and courage to strike the fatal blow in order to save himself from serious bodily harm or losing his own life. Fourth, the defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance.

State v. Curry, 752 S.E.2d 263, 266 (S.C. 2013); State v. Davis, 317 S.E.2d 452, 453 (S.C. 1984). The PPPA excises the fourth element—the duty to retreat. A defendant must still fulfill the remaining three elements to advance a self-defense defense in South Carolina.

Under the Castle Doctrine, the absence of a duty to retreat does not extend to a visitor or social guest in the home of another unless "the attacker is an intruder." See State v. Brown, 467 S.E.2d 922 (1996) (applying the common law and holding that "a lawful guest attacked in the owner's home has no duty to retreat where the attacker is an intruder."). Here, there is some dispute about the relationship between Foreman and Heyward, which would affect Heyward's ability to claim the protections of the Castle

5

Doctrine. Foreman gave Heyward the key to his house, Tr. 17:1,[3] and Heyward would stay in Foreman's house "pretty often," "maybe about once a week." Tr. 22:12–18. Heyward kept "his little bag" at Foreman's house, but never moved any furniture into Foreman's house. When he was at Foreman's house, Heyward would stay in the front bedroom. Tr. 25:3–10. While Heyward did mostly keep his clothes in the backpack that he brought with him to Foreman's house, he also permanently kept some things at Foreman's house, including sneakers. Tr. 42:19–43:12. The court adopts the findings of the state court that Heyward "was residing at 2232 Suffolk Street and was in a place where he had a right to be." ECF No. 60, Ex. 2 State Court Order. This allows Heyward to fulfill the threshold inquiry of the Castle Doctrine. But the state court found that Heyward did not satisfy the remaining requirements of the Castle Doctrine, and that he did not satisfy the elements of self-defense in South Carolina as articulated in State v. Curry, 752 S.E.2d 263 (S.C. 2013). In relevant part, the state court held that Heyward did not satisfy the requirements of the PPPA because:

> There is no evidence that the victim, Collette Warren was attempting to unlawfully and forcibly enter the residence. The fatal shot struck her as [she] was backing out of the driveway. She was buckled into the driver's seat with a lighter in one hand, cigarette in another, her phone was in her lap, and she was wearing high heels and an outfit that suggested anything but armed robbery.

ECF No. 60, Ex. 2, State Court Order. The order goes on to say that the first two elements of self defense are questions of fact for the jury, and that this determination "can only be made after the question of whether or not the Defendant's version of events is true has been answered." ECF No. 60, Ex. 2 State Court Order. Because no jury ever

---

[3] All citations to the transcript are cites to the transcript of the "Stand your ground" hearing in state court, available at ECF No. 60, Ex. 1, State Court Transcript.

6

determined whether Heyward actually believed he was in imminent danger and whether he was without fault in "bringing on the difficulty," it is now for this court to determine whether Heyward has a colorable self-defense claim.

There are some facts to indicate that Heyward did believe that he was getting robbed. Heyward contends that he did not know it was Warren in the vehicle. Since the vehicle that drove up to the house and paused in the driveway was a burgundy SUV and Warren would always drive a green Suburban when she visited the house, this seems plausible. Tr. 25:20–24; 26:19–21 (Foreman testifying that every time that Warren would come to the house, she would drive a green Suburban). Warren also stated that he saw a white car "pull up," and that it was the presence of this white car that made him believe he was being robbed. Magdalene Taylor ("Taylor"), a neighbor who was woken up by the shooting, corroborated Warren's story that there was a white car on the street <u>after</u> the shooting. Tr. 168:10–169:4. The presence of the white car along with the fact that Warren was driving a different car than the one she usually drove, weighs in favor of finding that Heyward thought that he was going to be robbed. Furthermore, Heyward testified that the night before the incident, someone "jump[ed] the back gate . . . fence" and that he heard it. Tr. 55: 24–56:5. Heyward states that he discussed this incident with Foreman, but Foreman did not relay this incident to Detective Bailey, the responding officer. Tr. 141:1–14. Finally, Heyward testified that he had just gotten a settlement check for $10,000, although he also testified that he did not have the check with him at the time of the shooting. Tr. 100:1–6.

But there are more facts to indicate that if Heyward was acting in self-defense, it was to promote his drug dealing, not that he was afraid of getting robbed. For one, when

police officers arrived at the scene and searched the home they found the firearm that Heyward used to shoot Warren along with cocaine and paperwork about Heyward's felon status in the broiler drawer of the oven. Tr. 127:19–128:15. In the statement that Heyward gave to detectives, he stated that he "dibbled, dabbled in it" and sold "here and there." Tr. 142:1–15. Furthermore, Warren's toxicology report shows that she had cocaine in her bloodstream, and there were additional drugs found on her person. Tr. 167: 5–20. And while there was a white car that was on the street that the shooting occurred <u>after</u> the shooting, there is no corroboration of Heyward's story from Taylor or from Foreman that the white car was on the street <u>before</u> the shooting. Since Heyward alleges that it was the presence of this white car led him to believe he was being robbed, the court is not convinced that this white car was anything more than a post-hoc justification of his actions.

After a thorough consideration of the state court transcript, Heyward's statement to detectives, as well as the order that the state court issued after hearing testimony from all of the witnesses including Foreman and Taylor, the court finds by a preponderance of the evidence that Heyward's version of events is an incredible one. There are no facts to corroborate Heyward's story that he was being robbed, and many facts to corroborate the government's theory that Heyward was engaged in a drug deal when Warren made the unfortunate mistake of arriving at the house in an unfamiliar vehicle while Heyward was in a drug-induced paranoia. Courts have considered the use of firearms in such a drug deal gone bad and applied the second-degree murder cross-reference. For example, in <u>United States v. Sarvis</u>, 601 F. App'x 176, 180 (4th Cir. 2015), the Fourth Circuit upheld a second-degree murder cross-reference where the defendant "fired at least fifteen rounds

from a high-powered assault rifle in a public housing complex after a drug deal went bad, killing one person and resulting in bullets entering nearby homes and vehicles," reasoning that the defendant could not assert self-defense under either federal or North Carolina law. It is the same seemingly indiscriminate spraying of bullets that occurred here.

Certainly, neither South Carolina nor federal law allows self-defense as a defense while engaged in drug trafficking. In United States v. Lomax, 293 F.3d 701, 704 (4th Cir. 2002), the Fourth Circuit held that it was precisely because a firearm "could provide a defense against someone trying to steal drugs or drug profits, . . . [a]nd a gun could serve as protection in the event that a deal turns sour" that the defense of self-defense was unavailable to a defendant charged with use of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). In State v. Smith, 706 S.E.2d 12, 15–16 (S.C. 2011), the court held that the trial court properly refused to charge the jury on voluntary manslaughter where there was no evidence to indicate that the defendant lawfully armed himself in self-defense given that the defendant engaged in a drug deal, while armed with a loaded gun, knowing the victim owed him money from a previous drug transaction.[4] Additionally, Heyward is being prosecuted in federal court for being a felon in possession of a firearm, and under South Carolina law his unlawful possession of the firearm also defeats the requirement that he be "without fault." See

---

[4] The government cites State v. Davis, 317 S.E.2d 452 (S.C. 1984) for the proposition that the South Carolina Supreme Court has decided that "shooting at a car based on a perceived threat of robbery because he was a drug dealer defending his turf means that he was not without fault in bringing the difficulty." But Davis says nothing of the sort. Instead, Davis simply suggested a jury instruction for a self-defense charge that included the element that the defendant "must be without fault in bringing on the difficulty." Davis, 317 S.E.2d at 453.

State v. Slater, 644 S.E.2d 50, 52 (S.C. 2007) (South Carolina Supreme Court held that the defendants' "unlawful possession of the weapon was the proximate cause of the homicide," and that this failed the requirement that under South Carolina law the defendant must be "without fault in bringing on the difficulty."); see also State v. Hinson, 2014 WL 2582763, at *4 (S.C. Ct. App. Mar. 19, 2014) (holding that trial court did not err in denying request for self-defense charge where defendant was a convicted felon who acted in violation of the law by carrying a firearm).

In Smith, the Supreme Court of South Carolina noted that the trial court "correctly observed" that there was no evidence of self-defense in stating "I just don't see how in the world that the evidence can be construed that [defendant] was without fault in bringing on the difficulty, and how he was in imminent danger of losing his life or sustaining serious bodily injury." Smith, 706 S.E.2d at 15. Under the facts of this case, this court echoes that sentiment—Heyward was certainly not without fault for ingesting cocaine and marijuana, succumbing to a drug-induced paranoia wherein he saw phantom cars and heard whispers from cars that no witnesses, including his neighbor Taylor and Foreman who was also in the house at the time of the shooting, happened to also see or hear. Heyward cannot claim self-defense under either federal or South Carolina law.

### B. Voluntary intoxication

Heyward argues that the shooting is a result of drug-induced panic and paranoia, and that this mitigates the shooting to voluntary manslaughter as opposed to second-degree murder. The government does not dispute that Heyward had ingested an unspecified amount of cocaine before the incident and was high at the time of the shooting, but rebuts that this evinces the requisite malice to substantiate a second-degree

murder cross-reference. As a policy matter, the court certainly does not countenance a defendant getting high on cocaine and marijuana, becoming mired in a state of paranoia, and then shooting off a porch into the headlights of a car backing away from his house. But the legal question is whether a defendant who acts in the throes of drug-induced paranoia acts in the "heat of passion" to reduce what would otherwise be a second-degree murder to voluntary manslaughter. Because second-degree murder is not a specific intent crime, the court finds that Heyward's voluntary intoxication does not constitute a defense that mitigates second-degree murder to voluntary manslaughter.

During the hearing, there was much talk of the trajectory of the bullet. It is unnecessary for the court to determine whether Heyward was shooting indiscriminately at oncoming headlights or shooting into the car itself. What is important to the court's determination of the cross-reference issue is that Heyward shot at the headlights of a car while high on cocaine. A review of the state court order demonstrates that the state court found that while Heyward's drug-induced paranoia may have been genuine it was by no means reasonable. ECF No. 60, Ex. 2, State Court Order ("The death of Ms. Warren is exactly the type of reckless and unwarranted harm that the statute does not protect. The hallmark of the PPPA, and the common law Castle doctrine, is reasonableness and there was nothing reasonable about Defendant's actions that night.").

In <u>Reaves v. Sec'y, Fla. Dep't of Corr.</u>, 717 F.3d 886 (11th Cir. 2013), the defendant had ingested cocaine and alcohol before he shot the victim. The trial judge instructed the jury that "to the extent that [the use of drugs] merely arouses passions, diminishes perceptions, releases inhibitions or clouds reason and judgment," the jury should acquit the defendant of first-degree murder if it found that he had been "so

intoxicated from the voluntary use of drugs as to be incapable of forming [the] premeditated design to kill." Id. at 892. The judge instructed the jury on a number of lesser included offenses of first-degree murder, including second-degree murder. The judge did not, however, instruct the jury on voluntary manslaughter, as under Florida law voluntary intoxication is not an available defense for general intent crimes such as second-degree murder. See Wilson v. State, 871 So.2d 298, 301 (Fla. 1st Dist. Ct. App. 2004). Similarly, South Carolina does not allow a voluntary intoxication defense for general intent crimes such as second-degree murder. Indeed, South Carolina does not allow voluntary intoxication to be an excuse or a defense to any crime. In State v. Vaughn, 232 S.E.2d 328, 330 (S.C. 1977), the South Carolina Supreme Court stated this rule in no uncertain terms:

> We adopt the rule that voluntary intoxication, where it has not produced permanent insanity, is never an excuse for or a defense to crime, regardless of whether the intent involved be general or specific. Reason requires that a man who voluntarily renders himself intoxicated be no less responsible for his acts while in such condition. To grant immunity for crimes committed while the perpetrator is in such a voluntary state would not only mean that many offenders would go unpunished but would also transgress the principle of personal accountability which is the bedrock of all law. 'The effect of drunkenness on the mind and on men's actions . . . is a fact known to everyone, and it is as much the duty of men to abstain from placing themselves in a condition from which such danger to others is to be apprehended as it is to abstain from firing into a crowd or doing any other act likely to be attended with dangerous or fatal consequences.'

Id. (internal quotations omitted).

The facts of this case are similar to those in Fox v. State, 441 S.W.2d 491, 495 (Tenn. Crim. App. 1968), where the defendant went onto her porch in the nighttime, without turning on the outside light and without her glasses and starting shooting in the direction of a group of boys when she saw one of them approaching her house. In Fox,

the court held that second-degree murder was the appropriate crime for these facts.  Id. These facts are also reminiscent of the facts in United States v. Milton, 27 F.3d 203 (6th Cir. 1994), where the court held that a defendant who fired shots into a victim's car "must have been aware of a risk of death or serious bodily injury" and that this "gross deviation from a reasonable standard of care established the requisite malice aforethought to hold him accountable for second-degree murder."  Heyward's actions, of shooting multiple times at headlights of a car in the driveway, make clear that he was aware of a risk of death or serious bodily injury like the defendants in Milton and in Fox.

As already discussed, Heyward cannot claim the protections of self-defense under either South Carolina or federal law.  And because second-degree murder is a general intent crime, his drug-induced paranoia does not qualify as a voluntary intoxication defense.  Therefore, the court finds that the appropriate cross-reference in this case is not voluntary manslaughter but second-degree murder.

## IV. CONCLUSION

For the foregoing reasons, the court applies the second-degree murder cross-reference.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**July 6, 2018**
**Charleston, South Carolina**